UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LAKEISHA THOMPSON**, <br><br> Plaintiff, <br><br><br> vs. <br><br> **EQUIFAX INFORMATION SERVICES, LLC,** <br>**TRANS UNION, LLC**, <br><br> Defendants, <br><br> and <br><br> **MICHIGAN FIRST CREDIT UNION**, <br><br> Defendant/Counter-Plaintiff. | **2:18-CV-12495-TGB** <br><br><br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

If a consumer's credit report correctly shows her car loan's monthly payment amount, which had been $489, but also correctly shows that the entire loan amount of $10,008 is now due because it is in default, does the consumer suffer any concrete injury?  Because the Court concludes that the answer to this question is no, and because the Plaintiff also did not present any evidence of injury, the Defendant is entitled to summary judgment in this case.

1

This case is before the Court on Defendant's motion for summary judgment (ECF No. 42) and Plaintiff's motion for partial summary judgment (ECF No. 44). The motions have been fully briefed and the Court heard oral argument on October 25, 2019. Following oral argument, the Court ordered the parties to submit supplemental briefing in light of a newly decided Sixth Circuit case. *See* ECF Nos. 53-54. The Court additionally considers these briefs. For the reasons stated below, the Court will **GRANT** Defendant's motion for summary judgment and **DENY** Plaintiff's motion for partial summary judgment.

## I. Facts and Procedural History

In early 2016, Plaintiff Lakeisha Thompson executed a Retail Installment Sale Contract ("Contract") with Merollis Chevrolet to purchase a vehicle. ECF No. 42-1. The Contract required her to make 72 monthly payments of $489.98. *Id.* She began making monthly payments, but after only two or three, she stopped paying because a high-risk pregnancy required her to be off work. Thompson Deposition, ECF No. 42-2, PageID.406. Merollis Chevrolet assigned its interest in the Contract to Defendant Michigan First Credit Union. ECF No. 42-1. In May 2016, Plaintiff says she filed for bankruptcy, but she reaffirmed her obligation to pay Michigan First because she believed she would be able to continue making payments. *Id.*; ECF No. 42-2, PageID.407. But Plaintiff was unable to continue making payments, and she defaulted on the loan. ECF No. 42-3. Michigan First accelerated the balance of the Contract so that

the entire remaining balance on the loan became due and owing ($10,008). ECF No. 44-2, PageID.500. On December 8, 2016, the account representing the Contract was "charged off." *Id.* Michigan First has a policy of "charging off" debts prior to 365 days of being delinquent. Murray Deposition, ECF No. 44-9, PageID.548.

In May 2018, Plaintiff alleges she obtained her Equifax and Trans Union credit files and under Michigan First's trade line, Michigan First was reporting a scheduled monthly payment amount of $489. ECF Nos. 44-3, 44-4. Plaintiff argues this is inaccurate because the Contract was "charged off." ECF No. 44, PageID.491-92. According to Plaintiff, there is no scheduled monthly payment due—rather a lump sum balance of $10,008 is due. *Id.* Therefore, she asserts, the reporting of a positive monthly payment amount is "patently inaccurate." *Id.*

In June 2018, Plaintiff sent two letters to credit reporting agencies Equifax and Trans Union describing these alleged inaccuracies and requesting that Equifax and Trans Union "report this account with a $0 monthly payment." ECF No. 42-5 (Equifax letter); ECF No. 42-6 (Trans Union letter). Equifax responded by saying that it had requested more information from Michigan First "to verify the accuracy of the information you disputed." ECF No. 44-7, PageID.516. Equifax further stated that Michigan First had verified with Equifax "that the balance is being reported correctly." *Id.* at PageID.518. When Plaintiff again checked her credit report in August 2018, the "scheduled monthly

payment amount" field had not been changed from $489 to $0. ECF No. 44-8.

Plaintiff brings this suit against Michigan First alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").[1] Plaintiff alleges Michigan First negligently and willfully continued to report an inaccurate $489 scheduled monthly payment amount in response to her dispute and that it negligently and willfully failed to perform a reasonable investigation of her dispute. Complaint, ECF No. 1. Michigan First later brought a counterclaim against Plaintiff alleging breach of contract, seeking the remaining $10,008 balance on the car loan. ECF No. 39. Michigan First moves for summary judgment on both of Plaintiff's claims as well as its counterclaim. ECF No. 42. Plaintiff moves for partial summary judgment only on its claim alleging negligent noncompliance. ECF No. 44.

## II. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013);

---

[1] Plaintiff also sued Trans Union and Equifax, but this Court entered stipulated orders dismissing with prejudice all of her claims against them. *See* ECF Nos. 26-27. Therefore, only Plaintiff's claims against Michigan First Credit Union remain.

*see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

# III. Discussion

## A. The Fair Credit Reporting Act

Plaintiff brings this suit against Michigan First alleging violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), which was enacted by Congress "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Pittman v. Experian Info. Solu., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)). One of the ways the FCRA ensures accurate credit reporting is by regulating the duties of those who furnish information to consumer reporting agencies ("CRAs"). *See* 15 U.S.C. § 1681s-2. Under § 1681s-2(b), if a CRA provides notice to a furnisher of information that a consumer disputes the completeness or accuracy of any information the furnisher provided, the furnisher must (1) conduct an investigation; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report any inaccuracies, if they are found, to all CRAs who may have received the inaccurate information; and (5) correct any inaccuracies found in the information. § 1681s-2(b)(1)(A)-(E).

While consumers are precluded "from enforcing the requirement that furnishers, under § 1681s-2(a), initially provide complete and accurate consumer information to a CRA," they do possess "a private right of action against a furnisher who fails to satisfy one of the five duties identified in § 1681s-2(b)." *Pittman*, 901 F.3d at 628. Under §

1681*o*, a consumer may demonstrate that a furnisher *negligently* breached its duty to comply with one of these requirements or under § 1681*n*, may demonstrate that they did so willfully. *United States v. Bormes*, 568 U.S. 6, 7, (2012); 15 U.S.C. §§ 1681n, 1681o. However, to succeed on a claim under § 1681s-2(b), a plaintiff must meet "a threshold showing of inaccuracy or incompleteness in the reporting." *Pittman*, 901 F.3d at 629. Additionally, when willful noncompliance with its requirements under the FCRA are alleged, plaintiffs may recover statutory or punitive damages even when they have not alleged any actual damages. 15 U.S.C. § 1681n. To make out a showing of negligent noncompliance, however, plaintiffs must demonstrate that they suffered "actual damages." 15 U.S.C. § 1681o.

## B. Standing

Article III, § 2 of the Constitution extends the judicial power of the United States "only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*") (quoting U.S. Const. Art. III, § 2). Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* Standing is a jurisdictional requirement. *See Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002). Thus, if a plaintiff does not have standing, the court lacks subject matter jurisdiction. *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). To establish standing, a plaintiff must

meet the minimum threshold of having "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo II*, 136 S. Ct. at 1547. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, at the pleading stage, general factual allegations of injury may be sufficient. *Id.* However, in response to a motion for summary judgment "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' which for purposes of the summary judgment will be taken as true." *Id.* (internal citations omitted). Injury-in-fact is the "[f]irst and foremost" element of the standing inquiry; "[a]n injury in fact must be real, not abstract, actual, not theoretical, concrete, not amorphous." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019) (citing *Spokeo II*, 136 S. Ct. at 1548).

Michigan First argues that because Plaintiff did not incur any out-of-pocket costs related to the trade line reporting, was not denied credit or employment, and had not sought counseling or treatment because of

anything in her credit report, she has not suffered an injury-in-fact and therefore lacks standing. ECF No. 42, PageID.381-82. Defendant also argues that Plaintiff does not have a redressable claim because she does not seek monetary damages. *Id.*[2] Thompson argues that she has demonstrated an injury-in-fact in the form of emotional distress for which she can recover monetary damages, but also that Defendant's violations of the FCRA, standing alone, should be considered sufficient to confer standing. ECF No. 46, PageID.598-601.

The question of standing in the FCRA context was recently considered by the Supreme Court in *Spokeo II*. There, the Court held that a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." 136 S. Ct. at 1549; *see also Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017) ("This circuit has had the occasion to interpret *Spokeo*[*II*] and has concluded that a statutory violation in and of itself is insufficient to establish standing."). In *Spokeo II*, the Court considered a respondent who brought a claim alleging willful noncompliance with the FCRA, as Plaintiff does here. 136 S. Ct. at 1549. The Court used the case to further

---

[2] Before turning to Thompson's ability to satisfy the injury-in-fact requirement "it is well to keep in mind a distinction that's easy to miss in this area. There is a difference between failing to establish the elements of a cause of action and failing to show an Article III injury. One is a failure of proof. The other is a failure of jurisdiction. Yes, there can be overlap between the two inquiries. But they are not one and the same." *Huff*, 923 F.3d at 462. Here, Michigan First's argument that Plaintiff does not have a redressable claim because she does not seek monetary damages is an inquiry better left for the merits of Thompson's negligent and willful noncompliance claims.

develop its standing jurisprudence and determined that to satisfy standing's "concreteness" requirement under these circumstances, a plaintiff must allege[3] a "concrete harm" or a "material risk of harm" because "not all [FCRA] inaccuracies cause harm or present any material risk of harm." *Id.* at 1549-50. It then remanded for the Ninth Circuit to determine whether the particular procedural violations of the FCRA alleged by the respondent "entail[ed] a degree of risk sufficient to meet the concreteness requirement." *Id.*

On remand, the Ninth Circuit held that the FCRA provisions were established to protect consumers' concrete interests and "ha[d] little difficulty" concluding that those interests were "real, rather than purely legal considerations." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017) ("*Spokeo III*") (stating that the Supreme Court in *Spokeo II* "seems to have assumed that, at least in general, the dissemination of false information in consumer reports *can* itself constitute a concrete harm") (emphasis in original). But even if inaccurate credit reporting generally causes real harm to consumers, "it cannot be the case that every trivial or meaningless inaccuracy does so." *Id.* at 1116. In *Spokeo II*, for example, the Supreme Court stated that the reporting of an incorrect zip code, without more, could not create any concrete harm. 136

---

[3] *Spokeo* involved the district court's dismissal of the plaintiff's complaint on a motion to dismiss rather than a motion for summary judgment, where a plaintiff's burden to establish standing requires more than mere allegations. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 111 (9th Cir. 2017); *see also Lujan*, 504 U.S. at 561.

S. Ct. at 1550. And on remand, the Ninth Circuit in *Spokeo III* determined that the plaintiff had sufficiently alleged a material risk of concrete harm because he alleged that Spokeo falsely reported he was married with children, was in his 50s, employed in a professional field, had a graduate degree, and had a higher wealth level than he actually had. 867 F.3d 1116. The court reasoned that "[i]t does not take much imagination to understand how inaccurate reports on such a broad range of material facts about Robins' life could be deemed a real harm." *Id.*

The Sixth Circuit recently interpreted and applied *Spokeo II* in the FCRA context. In *Huff v. TeleCheck Services, Inc.*,[4] the plaintiff argued that a check verification company was inaccurately reporting his credit file under the FCRA because the report omitted that his driver's license was linked to six bank accounts and omitted two transactions occurring on those accounts. 923 F.3d 458, 461 (6th Cir. 2019). The check verification company moved for summary judgment arguing the plaintiff lacked standing. *Id.* at 462. The district court dismissed the case due to lack of standing and the Sixth Circuit affirmed. The Sixth Circuit analyzed the standing issue under the purview of *Spokeo II*, reiterating that "[a]fter *Spokeo*, we know there is no such thing as an 'anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury." *Id.*

---

[4] *Huff v. TeleCheck Services, Inc.*, is the case that the Court ordered the parties to submit supplemental briefing on following the hearing on the motions. *See* ECF Nos. 53-54.

at 463 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

The *Huff* court asserted that the plaintiff had three ways to satisfy Article III's standing requirement with his cause of action: (1) "the statutory violation created an injury in fact as applied to him because it actually injured him when the violation led, say, to a check decline"; (2) "the statutory violation did not injure him in any traditional way, but the risk of injury was so imminent that it satisfies Article III"; or (3) "the statutory violation did not create an injury in any traditional sense, but Congress had authority to establish the injury in view of its identification of meaningful risks of harm in this area." *Id.* at 463. The court found that Huff did not satisfy the first prong because he did not prove, let alone allege, that the check verification company had ever told a merchant to decline one of plaintiff's checks due to his linked information— and it had not. *Id.* at 462-63. Nor did he prove that he suffered for example, emotional distress. *Id.* at 463. The Sixth Circuit then considered whether the plaintiff's lawsuit demonstrated a "risk of imminent injury" to him. *Id.* In doing so, it elaborated on *Spokeo*'s "material risk of harm" formulation and stated that the "*threatened injury must be certainly impending to constitute injury in fact.*" *Id.* (emphasis added) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). It reasoned that the plaintiff's allegation that the check verification company's incomplete disclosure would cause him to suffer a check decline was "*highly*

*speculative.*" *Id.* (emphasis added). The court elaborated: "The question, bear in mind, is not whether [the plaintiff] faces some risk of a check decline in general but what *additional risk of harm* stems from [the defendant's] nondisclosure of [the plaintiff's] information." *Id.* at 463-64 (emphasis added). Considering this, the court stated Huff had not demonstrated a material risk of harm because, had the check verification company fully disclosed the information, Huff had not shown this would have reduced the risk a merchant would have declined his check. *Id.* at 464. Finally, the court determined Huff had not shown a statutory violation that created a procedural or intangible injury. *Id.* As a third avenue to prove an injury-in-fact, Huff argued that because the FCRA creates a duty that consumer agencies must disclose "[a]ll information in the consumer's file" upon request, 15 U.S.C. § 1681g(a)(1), and he provided evidence that the check verification company breached that duty, the breach alone should create a cognizable Article III injury. 923 F.3d at 464. The Sixth Circuit disagreed, concluding "that a violation of the law that results in the dissemination of an objectively false report does not necessarily cause a concrete harm if the disclosure has no consequences for the consumer." *Id.* at 465. Because the check verification company's alleged statutory violation had no actual adverse consequences on or to Huff, the alleged statutory violation could not harm Huff's interests under the FCRA. *Id.*

Applying *Huff*'s 3-part framework to Plaintiff's negligent and willful noncompliance claims shows that Plaintiff's claims lack standing.

### i. Actual Injury

First, Plaintiff cannot demonstrate that "the statutory violation created an injury in fact as applied to [her] because it actually injured [her]." *Huff*, 923 F.3d at 463. As in *Huff*, Thompson "does not allege, much less prove, harm in the flesh-and-blood or dollars-and cents sense of the term." *Id.* Thompson has submitted no evidence that she suffered any loss of credit or other financial harm as a result of Michigan First's alleged negligent and willful violation of the FCRA. She also concedes that she has not applied for credit since her dispute or experienced any negative economic consequences, such as the denial of a job or loss of a financial opportunity. ECF No. 42-2, PageID.402-03. But the Sixth Circuit also permits plaintiffs to recover emotional distress damages for FCRA claims, see *Bach v. First Union Nat. Bank*, 149 Fed.Appx. 354, 360-61 (6th Cir. 2005), and the court in *Huff* recognized that emotional distress could form the basis for injury-in-fact to confer standing, 923 F.3d at 463 ("[Huff] does not suggest that he wasted time or *suffered emotional distress* while looking for his linked information.").

Unlike the plaintiff in *Huff*, Thompson *does* allege that she suffered emotional distress as a result of the "inaccurate" reporting of a $489 monthly payment on her trade line. ECF No. 1, PageID.5. As Plaintiff argues in her supplemental brief, (ECF No. 53), that would appear to

meet the "actual injury" prong under *Huff*, but not so. This matter is before the Court on Defendant's motion for summary judgment and Plaintiff's motion for partial summary judgment. Therefore, while Plaintiff's *allegations* of emotional distress may have been sufficient to confer standing at the motion to dismiss stage, on a motion for summary judgment, Thompson "must 'set forth' by affidavit or other evidence 'specific facts' which for purposes of the summary judgment will be taken as true." *Lujan*, 504 U.S. at 561 (internal citations omitted). With respect to claims of emotional distress, courts in the Sixth Circuit impose a strict standard for recoverability, as they are wary that emotional distress damages are easy to manufacture. *See Kaplan v. Experian, Inc.*, No. 09-10047, 2010 WL 2163824, at *5 (E.D. Mich. May 26, 2010) ("[B]ecause emotional distress damages are so easy to manufacture, courts have imposed a strict standard to be applied for them to be recoverable."). Therefore, the Sixth Circuit requires plaintiffs to "reasonably and sufficiently explain[ ] the circumstances surrounding the injury" and states that plaintiffs cannot "rely on mere conclusory statements." *Bach*, 149 Fed.Appx. at 361 ("An injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements."). Again, the Court recognizes that it must keep the merits of Thompson's claims separate from the standing question. *See Buchholtz v. Meyer Njus Tanick, PA*, ---

F.3d ---, 2020 WL 35431, at *5 n.3 (6th Cir. Jan. 3, 2020). But bearing in mind the standard of proof for standing that is required at the motion for summary judgment stage, *Lujan*, 504 U.S. at 561, the Court finds case law on the merits to be at least somewhat useful in determining whether Thompson has met her burden to establish standing.

Here, Plaintiff argues that Michigan First's reporting of a $489 scheduled monthly payment caused her to suffer "stress, frustration, anxiety, and other forms of emotional distress." Plaintiff's Response to Defendant's Interrogatories, ECF No. 44-10, PageID.578. She alleges in her complaint that she "experienced undue stress and anxiety due to Defendants' failure to correct the errors in her credit file or improve her financial situation by obtaining new or more favorable credit terms as a result of the Defendants' violations of the FCRA." ECF No. 1, PageID.4. However, at the summary judgment stage, Thompson has not included any affidavits or other specific facts where she "sufficiently explains the circumstances surrounding the injury." *Lujan*, 504 U.S. at 561.

The Court has located one instance in Plaintiff's deposition where, in response to being asked if she has applied for credit within the last few years, she states: "I'm scared to apply for credit so, no, no, I haven't." ECF No. 47-2, PageID.637. Plaintiff does not cite to this exchange in her motion as an example of emotional distress, nor does she contend this fear to apply for credit was in any way related to the reporting of the $489 monthly payment trade line by Michigan First, rather than some other

aspect of her credit report, such as her unpaid student loan debt (which was also being discussed during the deposition) or her unpaid $10,008 car note which was in default. Additionally, in her responses to Defendant's interrogatories, Plaintiff states that her factual basis for seeking damages is that she sustained "stress, frustration, anxiety, and other forms of emotional distress as a result of Defendant's failure to correct her credit file." The lack of any evidence substantiating Thompson's bare allegations of emotional distress undermines Plaintiff's position that she has established an injury in fact. Further, the Sixth Circuit recently stated that it had its "doubts" that bare anxiety can be a cognizable injury for standing purposes under the Fair Debt Collection Practices Act. *See Buchholtz*, 2020 WL 35431, at *7; *id*. at *5 (citing the Restatement (Second) of Torts § 46 (1965) for the proposition that the "possible liability for emotional harm [is defined] narrowly to exclude mere anxiety").

And even if Thompson's bare allegations of emotional distress could satisfy the injury-in-fact requirement, she must also satisfy the remaining two prongs of standing: traceability and redressability. Thompson would need to show "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). But her deposition testimony does not show, or even suggest, that her emotional distress is fairly traceable to Michigan First's allegedly inadequate

investigation or to the "inaccurately" reported $489 monthly payment—as opposed to being traceable to the fact that the trade line is accurately reporting a $10,008 balance on the loan that is *presently* due and owing, or her outstanding student loans. Thus, Thompson has not shown that her allegations of "stress, frustration, anxiety, and other forms of emotional distress" are an "actual injury" to confer standing.

### ii. Risk of Imminent Injury

Turning to *Huff*'s second prong—that the alleged statutory violation created a "risk of injury . . . so imminent that it satisfies Article III,"—the Court finds that Plaintiff has not demonstrated a material risk of harm. Given *Huff*'s requirement that if the plaintiff cannot demonstrate an actual injury, she must allege a "threatened injury" that is "certainly impending," Thompson's proofs fall short here. 923 F.3d at 463. Plaintiff argues that a trade line inaccurately reporting a $489 monthly payment "creates a risk that a lender *might* refuse to extend credit to Plaintiff, because the lender would understand [Michigan First's] reporting to mean that Plaintiff owes a $489 scheduled payment to [Michigan First] for this month and that money therefore cannot be used to satisfy any credit to be extended by the lender." ECF No. 53, PageID.879. But Plaintiff's argument wholly ignores that the trade line is also accurately reporting that the loan has been accelerated and that she technically owes $10,008 *immediately*, not $489 over 72 months.

Such a debt would clearly loom much larger, to any creditor examining Plaintiff's credit report than a standard monthly car loan payment.

The Ninth Circuit's unreported decision in *Jaras v. Equifax Inc.*, 766 Fed. Appx. 492 (9th Cir. Mar. 25, 2019) is instructive. *See* ECF No. 48, PageID.703. In *Jaras*, the Ninth Circuit analyzed the "risk of imminent injury" requirement following *Spokeo III* and affirmed a district court's dismissal of a plaintiff's complaint due to lack of standing.[5] 766 Fed. Appx. at 494-95. The Ninth Circuit clarified that in *Spokeo III* it held the plaintiff had standing by emphasizing that "the inaccuracies in the credit report at issue had already been requested and obtained by at least one third party, and that they were of a type likely enough to cause harm to his employment prospects at a time when he was unemployed and actively looking for work." *Id.* at 494. Conversely, the plaintiffs in *Jaras* lacked standing because they were a group of individuals in bankruptcy who "have not alleged that they tried to enter any financial transaction for which their credit reports or scores were viewed at all, or that they plan to imminently do so, let alone that the alleged inaccuracies would make a difference to such a transaction." *Id.* The court gave particular attention to the plaintiffs' bankruptcy status,

---

[5] In *Jaras*, the district court dismissed the plaintiffs' complaint holding that the challenged statements were not inaccurate under the FCRA. 766 Fed. Appx. at 494. The Ninth Circuit affirmed but on standing grounds. *Id.*

noting that such bankruptcies would cause lower credit scores "with or without the alleged misstatements." *Id.*

The *Jaras* court reasoned that the plaintiffs' allegations were more like the zip code example provided by the Supreme Court in *Spokeo II*, than the biographical inaccuracies described in *Spokeo III* and held that the plaintiffs lacked standing, regardless of whether the information was or was not inaccurately reported. *Id.* at 494-95. *Jaras* is in line with *Huff.* Indeed, the inquiry under *Huff* was "not whether [the plaintiff] faces some risk of a check decline in general but what *additional risk of harm* stems from [the defendant's] nondisclosure of [the plaintiff's] information." 923 F.3d at 463-64.

Similarly, the question here is not whether Thompson faces some risks of credit unworthiness or low credit in general, but what "additional risk of harm" stems from the "inaccurate"[6] reporting of a $489 monthly payment. And here, Thompson has not alleged that she tried to enter into any financial transaction or that she plans to imminently do so. While she does argue that this alleged inaccuracy would make a difference to such a transaction that "might" occur, Thompson's presently due and

---

[6] *Spokeo*, *Jaras*, and *Huff* assume for the sake of argument that the underlying information is being reported inaccurately. *See Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 629 (6th Cir. 2018) (stating that the threshold showing for any claim brought under § 1681s-2(b) is that the reporting was inaccurate or incomplete). Here, the parties dispute whether the $489 payment amount is accurate or not. For purposes of standing, the Court will assume for the sake of argument that the reporting is inaccurate.

owing $10,008 balance on the car loan—which is accurately reported on her trade line—would create the risks that a lender might refuse to extend credit to her with or without the alleged inaccuracy. In other words, Thompson has not shown that a $489 monthly payment on her trade line would create an additional risk of harm given a reading of the trade line as a whole.

Plaintiff relies on two unpublished dispositions from the United States District Court for the District of Arizona, see *Hamm v. Equifax Information Services LLC*, 2018 WL 3548759, at *2 (D. Ariz. July 24, 2018), and *Wheeler v. Trans Union LLC*, 2018 WL 2431876, at *2 (D. Ariz. May 30, 2018), as well as a case from the District of South Carolina, see *Burns v. Trans Union,* 2019 WL 3890833 (D.S.C. Aug. 19, 2019). However, these cases fail to convince. First, as unpublished orders from the District of Arizona and the District of South Carolina, they have no precedential value in this Court. Second, all three orders address motions to dismiss where the plaintiff's burden to demonstrate an injury is much lower—where the plaintiff may rely on "mere allegations" to support the concrete injury or "material risk" of such injury to establish standing, and the court must accept those allegations as true. And third, neither case confronts the ruling considerations raised by the Sixth Circuit in *Huff* and the Ninth Circuit in *Jaras* that the "threatened injury must be *certainly impending* to constitute injury in fact," and create an

"additional risk of harm" to the plaintiff that was not already present on the trade line. 923 F.3d at 462-63.

In *Hamm*, the court found that a plaintiff's allegations were sufficient to confer standing where she alleged that the defendant incorrectly listed an account as "charged off" when it should have been listed as "closed." 2018 WL 3548759 at *2. Further alleging that this inaccuracy caused her to refrain from applying for new credit or more favorable lines of credit and additionally caused her undue stress and anxiety, the plaintiff was found to have had sincere risk of harm for purposes of standing. And in *Wheeler*, a plaintiff alleged that Trans Union violated the FCRA by failing to remove dispute language in a trade line. 2018 WL 2431876, at *1. As a result of the inaccuracy, the plaintiff claimed he had "(1) been forced to refrain from applying for new credit or more favorable terms on existing credit lines; and (2) experienced undue stress and anxiety due to [Trans Union's] failure to correct errors in his credit file or improve his financial situation . . . ." *Id.* (internal quotation marks omitted). On a motion to dismiss, the district court determined that the plaintiff had standing to bring an FCRA claim against Trans Union because (1) he alleged that the violation caused him harm, (2) the dissemination of inaccurate information clearly implicated his concrete interests in credit reporting and (3) the nature of the alleged reporting inaccuracy was not "trivial or meaningless" because "users of [the plaintiff's] consumer report *may* find it important that [he] continues to

dispute a particular trade line in determining whether to extend new credit lines or modify those that already exist." *Id.* at *2. Because the plaintiff appropriately feared that he could not obtain new or modified credit lines, and alleged that he suffered psychological, emotional, and financial harm as a result, the plaintiff manifested a concrete injury. *Id.*

The most on-point case that Plaintiff cites is *Burns v. Trans Union, LLC.*, 2019 WL 3890833 (D.S.C. Aug. 19, 2019). In *Burns*, the district court considered a plaintiff's allegation that her tradeline was reporting a $70.00 monthly payment after the defendant "closed and charged off her account." *Id.* at *1. Understanding that "closed and charged off" account meant the account had been closed, a monthly payment was no longer due, but the total amount of the loan remained due and owing, the court denied the defendant's motion to dismiss on standing grounds, as well as the merits. With respect to standing, the court held that the plaintiff's complaint sufficiently alleged that "she experienced both credit and emotional damages, undue stress, and anxiety," and was more than a bare procedural violation under *Spokeo II*, claiming that "[o]ther courts faced with a similar claim have found the threat of harm bad credit imposes is cognizable and actually does exist." *Id.* at *2 (citing *Thompson v. San Antonio Retail Merchs. Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982) ("Even when there are no out-of-pocket expenses, humiliation and mental distress do constitute recoverable elements and damages under the [FCRA.]")).

But what *Hamm*, *Wheeler*, and *Burns* do not address is the Sixth Circuit's requirement that the risk of harm actually stem from the procedural violation, or the ability to prove that with something more than bare allegations at the motion to dismiss stage. *See Huff*, 923 F.3d at 463-64 (citing *Macy v. GC Servs. Ltd.*, 897 F.3d 747, 758 (6th Cir. 2018) (risk of harm must stem from the procedural violation)). In the context of a summary judgment motion, where the violation results in a trade line that reports *both* a monthly payment *and* the total amount of the loan remaining due and owing, there must be some evidence in the record that would allow a reasonable juror to conclude that the risk of harm stems from the allegedly incorrect monthly payment and not the total amount of the remaining loan. And here, any consumer of Plaintiff's Equifax or Trans Union credit report would see a trade line reporting that a $10,008 balance is currently due and owing on the loan, that the account status is "Closed – Derogatory," and that the payment status is "Collection/Charge-Off." *See* ECF No. 44-4. This record suggests that a consumer of Plaintiff's credit report would have reason to decline to extend her credit because she currently owes $10,008 to Michigan First for a "charged off" "derogatory" car loan, not because she owes a scheduled $489 monthly car loan payment to Michigan First. *See Jaras*, 766 Fed.Appx. at 494. As the Sixth Circuit concluded in *Huff*, the risk that the $489 monthly payment field "might" cause a lender to refuse to extend credit to Plaintiff is "highly speculative" given all of the other

24

accurately-reporting fields on the trade line that suggest Plaintiff may represent a credit risk. Accordingly, Plaintiff cannot show a risk of imminent injury to confer standing.

### iii. Statutory Violation as Intangible Injury-in-Fact

Turning to the final *Huff* prong, Plaintiff argues that Michigan First's violation of the FCRA, alone, creates an injury conferring Article III standing because "Congress established the FCRA provisions at issue to protect consumers' concrete interests." ECF No. 46, PageID.600; ECF No. 53, PageID.800. But Thompson's argument misses a key facet of the Sixth Circuit's reasoning in *Huff*; a plaintiff's concrete interests under the FCRA can only be harmed by an alleged statutory violation if she can show that the violation had adverse consequences. *See Huff*, 923 F.3d at 465. To be sure, the plaintiff in *Huff* failed even to make allegations of an actual injury such as emotional distress, relying solely on the risk of imminent injury and a statutory violation as a basis for standing. In that sense, Huff was grasping at straws to show that the violation made a difference, and the court concluded that "because [the check reporting agency's] nondisclosure never harmed Huff, and because it did not create a material risk that Huff would suffer a check decline, Huff has not suffered an injury in fact." *Id.* at 468. But because we have already determined that the complaint's bare allegations of emotional distress are insufficient at the summary judgment phase, Plaintiff is left in the same predicament as Huff, lacking any injury in fact. Like Huff,

Thompson has not shown that the allegedly false trade line had any harmful effect on her or her future conduct; she merely alleges a lender *might* refuse to extend credit without any proof that that harm might be imminent.

Accordingly, Plaintiff cannot show that Michigan First's alleged violation of the FCRA, alone, created an Article III injury-in-fact and her complaint must be dismissed.[7]

## C. Accuracy of the Michigan First Trade Line

Given the complexity of this area of the law and that Defendant raised the issue of standing after the close of discovery and in its motion for summary judgment briefing, the Court will assume *arguendo* that it has jurisdiction over Plaintiff's claims and consider their merits. In doing so, the Court concludes that Michigan First's trade line is neither patently inaccurate nor materially misleading and accordingly Plaintiff's § 1681s-2(b) claims must fail.[8]

---

[7] Traditionally, when courts find that they lack standing and therefore must dismiss a case due to lack of subject matter jurisdiction, they dismiss the case without prejudice because they did not reach the merits of the Plaintiff's claim. *See Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 Fed. Appx. 6, 11 (6th Cir. 2018). However, because this Court alternatively finds that Plaintiff's claims must fail on their merits, it dismisses the complaint with prejudice.

[8] Defendant also asserts that Plaintiff's claims are moot, arguing that Thompson conceded in her deposition that she was no longer seeking a dollar amount from Michigan First. ECF No. 42, PageID.379-81. Defendant's argument is premised on its assertion that when a plaintiff does not seek monetary damages and injunctive and declaratory relief are not available remedies, the case must be dismissed. However, under the FCRA plaintiffs may recover statutory or punitive damages when they allege willful noncompliance with its requirements. 15 U.S.C. § 1681n. Only when negligent noncompliance is alleged must plaintiffs demonstrate that they

Under § 1681s-2(b), upon notice of a dispute, a furnisher of information to CRAs must (1) conduct an investigation; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report any inaccuracies, if they are found, to all CRAs who may have received the inaccurate information; and (5) correct any inaccuracies found in the information. § 1681s-2(b)(1)(A)-(E). A consumer may demonstrate that a furnisher negligently breached its duty to comply with one of these requirements under § 1681*o* or that they did so willfully under § 1681*n*. *United States v. Bormes*, 568 U.S. 6, 7, (2012); 15 U.S.C. §§ 1681n, 1681o. However, to succeed on a claim under § 1681s-2(b), a plaintiff must meet "a threshold showing of inaccuracy or incompleteness in the reporting." *Pittman*, 901 F.3d at 629. "To meet this threshold showing, a plaintiff can show that the information provided is false or that it contains a material omission or creates a materially misleading impression." *Id.* at 630 (citing *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617-18 (6th Cir. 2012)); *see also Saunders v. Branch Banking & Trust Co., of Va.*, 526 F.3d 142, 148 (4th Cir. 2008) ("Congress clearly intended furnishers to review reports not only for inaccuracies in

suffered "actual damages." 15 U.S.C. § 1681o. Therefore, Defendant's mootness argument is unavailing as to Plaintiff's willful noncompliance claim—Plaintiff need not seek monetary damages to recover under § 1681n. As to Plaintiff's negligent noncompliance claim, because the Court concludes that the information reported in the Michigan First trade line was not inaccurate, it need not consider whether the claim is moot.

the information reported but also for omissions that render the reported information misleading."). "[R]eporting is accurate for purposes of the FCRA as long as it is technically accurate, or accurate on its face." *Shaw v. Equifax Info. Sols., Inc.*, 204 F.Supp.3d 956, 960 (E.D. Mich. 2016) (citing *Dickens v. Trans Union Corp.*, 18 Fed. Appx. 315, 318 (6th Cir. 2001)).

> [A] plaintiff has failed to carry his initial burden if a court finds that the information contained in a challenged credit report was accurate on its face, or put somewhat differently, "technically accurate." That is, a credit reporting agency satisfies its duty under section 607(b) if it produces a report that contains factually correct information about a consumer that might nonetheless be misleading or incomplete in some respect.

*Dickens*, 18 Fed. Appx. at 318 (quoting *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)). "A consumer's conclusory allegation that a report is misleading is insufficient to meet this standard delineated by the Sixth Circuit." *Shaw*, 204 F.Supp.3d at 960. "[A]t a minimum, a plaintiff must provide that a creditor or consumer of credit reports *would be* misled. When the recipient was not misled, such a showing will be extremely difficult." *Elsady v. Rapid Global Bus. Sols., Inc.*, 2010 WL 2740154, at * 7 (E.D. Mich. July 12, 2010) (emphasis added). "The standard, and the definition of accuracy, remains the same in cases involving both credit reporting agencies and furnishers of information." *Shaw*, 204 F.Supp.3d at 960.

In this case, several important facts are not in dispute. First, the parties do not dispute that Plaintiff's account with Michigan First has been "closed out" and "charged off." They also do not dispute that the remaining balance on the loan ($10,008) has been accelerated and is due and owing immediately. Plaintiff's cause of action against Michigan First is based on her belief that, in order to be accurate, the "monthly payment" field of her Michigan First trade line may only contain what she is *currently* scheduled to pay on the loan on a monthly basis; and because the loan has been accelerated and is immediately due, she owes $10,008 immediately, not $489 per month over the course of the next several months. Because that field says $489 (which is the monthly payment amount prior to default), rather than $0 (because now the lump sum amount of $10,008 is due), Thompson contends the trade line is both patently inaccurate and materially misleading. But Plaintiff offers no authority to support her argument that the trade line's "monthly payment" field must reflect what she is *currently* "scheduled" to pay on the loan on a monthly basis. Indeed, her Trans Union and Equifax credit reports do not even use the term "scheduled monthly payment," they simply say "monthly payment."

Thompson references deposition testimony from Michigan First's Rule 30(b)(6) witness, Cliff Murray, who testified that a "scheduled monthly payment is the contractual payment that is expected from the member as a result of the agreement," ECF No. 44-9, PageID.564, and

claims that even under this definition the trade line is reporting inaccurate information. ECF No. 44, PageID.492. But Michigan First contends it is not inaccurate or materially misleading to say that the "monthly payment" field merely reports what the monthly payment amount *was* under the contractual agreement between Thompson and Michigan First, especially given that the trade line, when read as a whole, indicates the $489 payment was historical.

The Court finds that the Michigan First tradeline on Plaintiff's Equifax and Trans Union credit reports are accurate on their face because the reports "contain[ ] factually correct information about [Plaintiff] that might nonetheless be misleading or incomplete in some respect." *Dickens*, 18 Fed. Appx. at 318. It is clear from reading the trade line as a whole that the "monthly payment" field is historical rather than current because other fields in the trade line state that the balance is "$10,008," that the "payment status" is "collection/charge-off," that the "amount past due" is "$10,008," that the account's "closed date" is "Jan 1, 2017," and that the "account status" is "closed – derogatory." *See* ECF Nos. 44-3, 44-4. Any creditor or consumer of credit reports reading Plaintiff's Michigan First's tradeline would not be misled. *See Elsady*, 2010 WL 2740154, at * 7 ("[A] plaintiff's mere assertion that a report was misleading, or even his proof that a lay person would be mislead [sic], is insufficient to establish that a report was misleading and, therefore, inaccurate."). That Plaintiff has not argued that a single creditor or

consumer of credit reports was indeed misled by the trade line further supports this. *Id.*

Plaintiff points to two pages of a "Credit Reporting Resource Guide" ("CRRG") stating that charged off accounts should report a "scheduled monthly payment amount" as "zero," claiming that this is an industry-wide standard. Even assuming that Plaintiff is correct in asserting that the CRRG's recommendation represents an accepted industry standard, she offers no authority from this jurisdiction or any other for the proposition that a furnisher's deviation from the CRRG renders a credit report inaccurate. Plaintiff relies solely on *Gallaher v. US Bank N.A.*, 2017 WL 2111593, at *7 (D. Conn. May 15, 2017), for the CRRG's relevance, but there the court merely stated that the defendant was relying on the CRRG and the plaintiff did not question the CRRG's requirements; the court did not recognize the CRRG as the industry standard or conclude that compliance or non-compliance with its provisions was conclusive evidence of accuracy or inaccuracy. *Id.*

But in response, Defendant has provided the Court with authority from other jurisdictions showing that failure to comply with the CRRG does not render a report inaccurate. *See Hupfauer v. Citibank*, 2016 WL 4506798, at *4 n.5 (N.D. Ill. Aug. 19, 2016) ("Plaintiff's argument that Experian's reporting deviated from guidelines set by the Consumer Data Industry Association is beside the point, as these guidelines do not establish the standards for accuracy under the FCRA and cannot form

the basis for FCRA liability."); *Mortimer v. Bank of Am., N.A.*, 2013 WL 1501452, at *12 (N.D. Cal. Apr. 10, 2013) (stating that "failure to comply with the CDIA guidelines [i.e., the CRRG] does not render the report incorrect"); *Co v. JP Morgan Chase Bank*, 12-6560, 2013 WL 1788061, at *2 (N.D. Cal. Apr. 26, 2013) ("[P]laintiffs directed the court to certain guidelines of the Consumer Data Industry Association, but plaintiffs concede that these guidelines are not binding on Chase, and that non-compliance with the guidelines does not constitute a violation of FCRA."); *see also Cowley v. Equifax Info. Servs., LLC*, 2019 WL 5847851 (W.D. Tenn. Nov. 7, 2019) (concluding that CCRG was inadmissible hearsay as it was not authenticated by an expert witness through declaration or deposition, and because plaintiff provided no other evidence in support of her claim that defendant's reporting was inaccurate, plaintiff could not dispute defendant's affidavit explaining scheduled monthly payment was accurate).

Either way, Plaintiff explicitly stated she was not relying on the CCRG to show that Michigan First's reporting was patently inaccurate or materially misleading. *See* ECF No. 46, PageID.604 (stating that "[r]ather, Plaintiff relies on the CRRG to show that [Michigan First's] violation of the FCRA was, at least, negligent, because [Michigan First] failed to conform to the industry standard"). So the Court will not find that a mere failure to follow the CCRG is proof that a trade line entry is false or misleading. On the record before the Court, reading the trade

line in context and as a whole, a creditor or consumer of credit reports would not be misled by the "monthly payment" field.

Because Plaintiff cannot demonstrate that her Michigan First trade line was either inaccurate or misleading, her claims for negligent and willful violations of 15 U.S.C. § 1681s-2(b) must be dismissed. *See Shaw*, 204 F.Supp.3d at 962.[9] Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's claims and **DENIES** Plaintiff's motion for partial summary judgment.

## D. Defendant Michigan First's Breach of Contract Counterclaim

"A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). Here, Plaintiff concedes that she signed the loan agreement for her automobile purchase—so there was a contract, she failed to make the required monthly payments—which is a breach of the contract, and that by failing to make payments, Michigan First suffered damages. Plaintiff's Response to Michigan First's Request for Admissions, ECF No. 42-3, PageID.430. While she denied having no

---

[9] As Plaintiff cannot meet the threshold requirement that the information was inaccurate, the Court need not consider whether Michigan First conducted a reasonable investigation pursuant to 15 U.S.C. § 1681s-2(b). *Shaw*, 204 F.Supp.3d at 962.

defense regarding liability to Michigan First for breach of contract, *Id.* at PageID.430-31, she does not dispute breach in her response to Michigan First's motion for summary judgment or argue why she is otherwise not indebted to Michigan First for the balance of the Contract. *See* ECF No. 46, PageID.605-06. Instead, she argues that Michigan First is not entitled to the attorney fees it seeks in addition to the balance of the loan. *Id.* Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to its counterclaim for breach of contract. The Court will issue a separate order determining the amount of attorney fees owed to Defendant.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.

DATED: February 18, 2020.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge